Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 547 | **DATE** | 1/14/2002 |
| **CASE TITLE** | Menchaca vs. American Medical Response | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, defendant's motion for a new trial is denied as to the issue of liability but granted as to the issue of back pay and punitive damages. Defendant's motion for remittitur is denied, and its motion for amendment of judgment is denied as moot. The case is set for a status hearing on 1/25/02 at 9:30 a.m. for the purpose of setting a prompt trial date.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 16 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 152 |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| OR6 | courtroom deputy's initials | 02 JAN 15 PM 1:59 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANNA MENCHACA, )
)
        Plaintiff, )
)
vs. ) Case No. 98 C 547
)
AMERICAN MEDICAL RESPONSE )
OF ILLINOIS, INC., )
)
        Defendant. )

DOCKETED
JAN 16 2002

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On June 13, 2001, a jury returned a verdict in favor of plaintiff Anna Menchaca in this Title VII gender discrimination case, awarding Menchaca $127,330 in back pay and $381,990 in punitive damages. Defendant American Medical Response of Illinois, Inc. (AMRI) has moved for a new trial, and/or for a remittitur of the damage award, and/or to amend the judgment.

A.    Liability issues

    1.    "Motivating factor" jury instruction

AMRI argues that the Court "instructed the jury on the wrong standard of sex discrimination." Dfdt. Mem. at 2. The jury was told that

> [i]n order to prevail on her claim against AMR, Menchaca must prove by a preponderance of the evidence each of the following:
>
>     1.    that her sex was a motivating factor in AMR's decision to discharge her, and
>
>     2.    that plaintiff suffered damages as a result of her discharge.

15d

The instruction that followed that one provided the jury with the definition of the term "motivating factor":

> When I say that Menchaca must prove that her sex was a motivating factor in AMR's decision to discharge her, I mean that she must prove her sex contributed to AMR's decision in a substantial way, or to put it another way, that AMR would not have discharged her if she had been a man and everything else remained the same. Menchaca is not, however, required to prove that sex was the sole motivation or even the primary motivation for AMR's decision.

AMRI argues that the Court should have charged the jury that to return a verdict for Menchaca it had to find that consideration of her gender was a "determinative factor" in AMR's decision. We reject this argument. The Seventh Circuit has told district judges not to use that term in employment discrimination cases, deeming it unnecessarily confusing. *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994).

AMRI also argues that it was improper to use the term "motivating factor" to describe Menchaca's burden of proving causation. But the language is taken directly from Title VII, which provides that the law is violated "when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. §2000e-2(m). In *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995), the Seventh Circuit held that a trial court that used the term "motivating factor" had "properly instructed the jury." *Id.* at 1350. *See also Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1033 (7th Cir. 1999) (saying that "motivating factor" is the appropriate standard under Title VII).

In a recent case involving the propriety of Title VII jury instructions, the Seventh Circuit stated that "[b]ecause the statute contains ['motivating factor'] language, district courts might be

better advised to ask juries to determine whether discrimination was a motivating factor in a defendant's employment decision. Of course, such an approach would probably require an accompanying instruction defining 'motivating factor.'" *Akrabawi v. Carnes Co.*, 152 F.3d 688, 694 (7th Cir. 1998). The Court followed this directive in instructing the jury in this case. The definition of motivating factor perhaps could have been simpler, as the Seventh Circuit suggested in *Gehring*, but the definition that we used included the very concept that *Gehring* proposed: "whether the same events would have transpired if the employee [had been outside the protected class] and everything else had been the same." *Gehring*, 43 F.3d at 344.

According to AMRI, use of an instruction of the type given by the Court is appropriate only in "mixed motive" cases, not in "indirect proof" cases like this one. The dichotomy is not as clear as AMRI argues. In this case, there was direct evidence of discriminatory animus on the part of the decision makers, and it is also conceivable that the jury could have seen this as a mixed-motive case (AMRI argued that it had good cause to terminate Menchaca; Menchaca argued that similarly situated male managers were treated more leniently). In any event, the statute does not say, and the Seventh Circuit has not suggested, that a plaintiff's causation burden should be described differently depending on the trial court's view of the "type" of case the plaintiff has.

### 2. "Same actor inference"

AMRI also argues that the Court erred in declining to instruct the jury on the so-called "same actor inference," that is, the proposition that if the same person hired and fired the plaintiff, the jury may infer that the termination was not discriminatory. However, the Seventh Circuit cases that AMRI cites for the proposition that "[i]t is well established that a trial court

3

should instruct the jury on the same actor inference," *see* Dfdt. Mem. at 8, actually say nothing of the kind. Rather, each of these cases – *Johnson v. Zema Systems Corp.*, 170 F.3d 734 (7th Cir. 1999); *Chiaramonte v. Fashion Bed Group*, 129 F.3d 391 (7th Cir. 1997); and *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) – concerned summary judgment rulings, not trials or jury instructions.[1] No Seventh Circuit case directs that such an instruction should be given; indeed in *Johnson*, the court noted that "the same-actor inference is unlikely to be dispositive in very many cases," *see* 170 F.3d at 745, and more recently, in *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001), the court stated that in *Johnson* it had "emphatically rejected the 'same-actor inference.'"

AMRI was free to argue to the jury that the fact that the same person allegedly hired and fired Menchaca ought to weigh against a finding of discrimination. But that does not mean that the Court had to instruct the jury on the issue. As the Seventh Circuit stated in *Gehring*:

> [A] judge need not deliver instructions describing all valid legal principles. Especially not when the principle in question describes a permissible, but not an obligatory, inference. Many an inference is permissible. Rather than describing each, the judge may and usually should leave the subject to the argument of counsel.

43 F.3d at 343. That is what the Court did in this case. It was not error to refuse to give a "same-actor" instruction.

### 3. Plaintiff's use of peremptory challenges

AMRI argues that Menchaca used certain of her peremptory challenges in a discriminatory manner, specifically to excuse three prospective jurors because they were older,

---

[1] AMRI also cites a Sixth Circuit case, *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461 (6th Cir. 1995), but that case held that it was not error to give a "same actor" instruction, not that it was error to decline to give one.

4

white males. The Court disagrees. When AMRI raised this challenge at the time of jury selection, the Court asked Menchaca's counsel to explain their reasons for the three strikes that AMRI attacked. Counsel satisfactorily explained each of these challenges on a non-discriminatory basis; they were based on attitudes expressed during *voir dire* and the particular employment backgrounds of certain of the prospective jurors, and not their age, race, or gender (or any combination of those factors). There is no evidence to support a claim of discriminatory use of the challenges.

4.      **"Stray remarks" evidence**

AMRI argues that the Court erred in allowing Menchaca to introduce testimony that Keith Rippy, who made the decision to fire Menchaca, had referred to her as a "fucking dyke" and as a "pit bull dyke." AMRI argues that these were "stray remarks" which were inadmissible because they were unrelated to the decision to fire Menchaca. But the law is clear that evidence of actions or statements reflecting a decision maker's prejudice are admissible even if they are not directly connected to the employment decision. *See, e.g., Huff v. Uarco, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997). *See generally Menchaca v. American Medical Response of Illinois, Inc.*, No. 98 C 547, 2000 WL 1141570, at *3 (N.D. Ill. Aug. 11, 2000). Title VII bars discrimination based on a woman's non-conformance with socially-constructed gender expectations, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989), and Rippy's comments were reflective of an attitude that Menchaca was too "tough" and thus did not conform to traditional sexual stereotypes.[2] The evidence was unquestionably relevant.

---

[2] AMRI denied that Rippy had made the statements and disavowed any contention that Rippy had discriminated against Menchaca based on sexual orientation. If that is what Rippy had
(continued...)

In its post-trial motion, AMRI argues that even if relevant, the evidence should have been excluded under Federal Rule of Evidence 403. But Rule 403 concerns only *unfair* prejudice, and there was nothing unfair about the prejudice to AMRI from this evidence, which concerned the attitude and intent of a decision maker. And even if the prejudice was somehow unfair, it was far outweighed by the strong probative value of the evidence.

### 5.  Use of Rochelle Ambriz's deposition

AMRI argues that the Court erred in permitting plaintiff to introduce the deposition of Rochelle Ambriz, arguing that Ambriz was not shown to be unavailable as required by Fed. R. Civ. P. 32(a)(3) as a prerequisite to introduction of her deposition. Ambriz had appeared pursuant to a subpoena issued by the plaintiff, but she was not able to testify on the day she appeared because the testimony of another witness was ongoing. On the following day, Ambriz could not appear due to an important employment-related responsibility (she was required to prepare the payroll for her employer). *See* Tr. 1133. The Court concluded that Ambriz was unavailable and that circumstances warranted using her deposition, Tr. 1133-34, 1142, and we told AMRI's counsel that he could call Ambriz in his case if he wished to do so. Tr. 1133. AMRI did not call Ambriz. Though it claimed that she did not respond to a subpoena that was served upon her, AMRI did not request a continuance so that it could bring her into court. *See* Tr. 1279-81.

The Court continues to believe that the circumstances were sufficient to warrant use of Ambriz's deposition based either on her unavailability, or alternatively because of exceptional

---

²(...continued)
done, it would not have violated Title VII. As we have explained, however, the evidence was relevant to show that Rippy had stereotyped expectations of female employees.

6

circumstances making it desirable to use her deposition. Fed. R. Civ. P. 32(a)(3)(D) & (E). But even if the Court erred in this regard, AMRI has not even attempted to identify any way in which it was prejudiced by this alleged error. Nor does it contend that it lacked a fair opportunity to question Ambriz in her deposition or that the jury got a one-sided version of Ambriz's testimony. For these reasons, the Court rejects AMRI's claim that the use of Ambriz's deposition should entitle it to a new trial.

**B.     Damages issues**

**1.     Back pay**

AMRI argues that it is entitled to a new trial because the jury should have been told to limit back pay to the period ending on February 20, 1998, when AMRI closed most of its Illinois operations. (We question whether this would be a basis for a new trial even if AMRI were correct; it seems more likely that it would serve as a basis for cutting the back pay award.) Though the Seventh Circuit has held that back pay is an issue for the court rather than the jury, the parties in this case expressly or impliedly consented to submission of the matter to the jury. *See Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000).

The purpose of back pay is to put the plaintiff in the same position she would have been in if the discrimination had not occurred, *Harper v. Godfrey Co.*, 45 F.3d 143, 149 (7th Cir. 1995), in other words to make the plaintiff whole. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982). Menchaca was discharged on August 12, 1997; before that she earned a salary of $46,500 per year. AMRI closed most (but not all) of its operations on February 20, 1998, and it argues that Menchaca would have been laid off then in any event, requiring back pay to be cut off at that date. But the evidence did not show that AMRI shut down entirely; it kept open its

7

Rockford, Illinois station. More importantly, there was testimony from AMRI's human resources director that management employees still employed at the time of the shutdown were offered job transfer opportunities to positions with AMRI's parent company, AMR Inc. AMRI facilitated such transfers, and some of Menchaca's fellow managers obtained jobs with AMR Inc. From this evidence the jury reasonably could infer that Menchaca, had she still been working for AMRI in February 1998, would have gotten a job with the parent company. In sum, the issue presented a jury question, and the jury reasonably could have found that by terminating Menchaca in August 1997, AMRI deprived her of wages that she would have earned from AMRI through February 1998 and from AMR Inc. following that date. There is no basis to overturn that determination.

### 2. Deduction of "interim earnings" from second job

Under Title VII, "[i]nterim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. §2000e-5(g)(1). As a manager employed by AMRI, Menchaca earned an annual salary of $46,500. After her termination, she could not find a management position and ended up taking a position as a paramedic with the Chicago Fire Department, earning approximately $33,500 working 48 hours per week (in two 24-hour shifts). This was approximately the same number of hours she had, on average, worked when employed at AMRI. Because of the reduction in salary, Menchaca also took a second job with a private ambulance firm; between the two jobs, she worked as many as 80 hours per week altogether. During the period she worked both jobs, Menchaca earned an amount that exceeded her AMRI salary.

In closing argument, Menchaca's attorney conceded that her Fire Department wages

8

should be deducted from back pay as "interim earnings." He calculated Menchaca's back pay following this deduction at $127,330, the amount the jury ultimately awarded. Tr. 1327-28. The jury clearly did not, however, deduct Menchaca's earnings from the second job that she took after her termination from AMRI.

The Court instructed the jury that "[f]rom any amount which you find Menchaca lost as a result of her termination, you must deduct such amounts as she has received from working a comparable number of hours in other employment." Tr. 1372. AMRI objects to the use of the phrase "a comparable number of hours," saying that everything that Menchaca earned from both replacement jobs should have been deducted.

The Court's instruction omitted an important element of the "interim earnings" analysis. As the Seventh Circuit put it in *Chesser v. State of Illinois,* 895 F.2d 330, 338 (7th Cir. 1990), the issue as to the deduction of interim earnings from a "moonlighting"-type job is whether the employee would have been unable to take the second job if she had remained with the defendant employer; if so, the wages are interim earnings that must be deducted. The defendant employer bears the burden of proving that the plaintiff could not have earned the additional income if she had remained employed with the defendant. *See Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1111 (8th Cir. 1994).

AMRI had no rule or policy prohibiting employees like Menchaca from moonlighting, but there was some evidence from which a properly-instructed jury could have found that as a practical matter, Menchaca would not have been able to take a second job if she had remained with AMRI. As manager of AMRI's Elston Avenue station, she worked long and irregular hours, and a reasonable inference could be drawn that she had to be available 24 hours a day if a

9

problem arose. *See* Tr. 220. Menchaca's Fire Department job, in contrast, required her to work two 24-hour shifts per week, which left her with several days open to fit in a second job. A properly-instructed jury could have concluded that she would not have had the same opportunity at AMRI.

In giving the "comparable hours" instruction, the Court attempted to follow the principle that the purpose of back pay is to put the plaintiff in the position she would have been in but for the defendant's illegal actions. *Ford Motor Co.,* 458 U.S. at 230. The law did not require Menchaca to take the second job after AMRI terminated her. *Cf. id.* at 231 (Title VII plaintiff is not required to "go into another line of work, accept a demotion, or take a demeaning position" to fulfill obligation to mitigate damages). And taking the second job was not a cost-free decision for Menchaca; she gave up her leisure time, a commodity with significant value. A properly-instructed jury reasonably may well have determined that the earnings from that job should not be deducted. The Court's instruction, however, effectively took that option away from the jury. It was told to compare hours worked and to deduct only the earnings made from working hours comparable to those she had worked at AMRI. Because the evidence showed that Menchaca's average weekly AMRI hours were roughly the same as her Fire Department on-duty time, the instruction essentially told the jury not to consider the earnings from the second job at all. This was contrary to *Chesser*. AMRI is entitled to a new trial on the issue of back pay.

### 3. Punitive damages

Title VII authorizes an award of punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination with malice or with reckless indifference to the plaintiff's federally protected rights. 42 U.S.C. §1981a(b)(1). To justify punitive damages, the

plaintiff must demonstrate that the employer acted with knowledge or a perceived risk that its actions would violate federal law, and that the employees who discriminated against the plaintiff were managerial agents acting within the scope of their employment. *Kolstad v. American Dental Association,* 527 U.S. 526, 535-36, 543 (1999). If the plaintiff makes the necessary showing, the defendant may nonetheless avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an anti-discrimination policy. *Id.* at 545.

AMRI does not challenge the wording of the punitive damages instruction but argues that the Court should not have instructed the jury on that issue because Menchaca failed to introduce evidence sufficient to support an award of punitive damages. AMRI says that it presented unrebutted evidence that it established and distributed an anti-discrimination policy, and its human relations manager testified that he reviewed the termination and did not believe it was motivated by Menchaca's gender. It argues that based on this evidence, punitive damages were inappropriate as a matter of law. Dfdt. Mem. at 12.

AMRI's reliance on its human resource manager's testimony is unavailing; it cites no case saying that such a witness's opinion regarding matters of which he had no first-hand knowledge is controlling. Thus AMRI's argument, boiled down to its essentials, is that its establishment and distribution of an anti-discrimination policy precludes an award of punitive damages. The Court disagrees. It is true that an employer may escape liability for punitive damages for a manager's acts if it can demonstrate a good faith attempt to establish and enforce an anti-discrimination policy. *Kolstad,* 527 U.S. at 545; *Cooke v. Stefani Management Services, Inc.,* 250 F.3d 564, 568 (7th Cir. 2001). But the Seventh Circuit has made it clear that though "the implementation of a written or formal antidiscrimination policy is relevant to evaluating an

11

employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001).

The evidence, viewed in the light most favorable to Menchaca, justified submitting her punitive damages claim to the jury. It was well within the jury's province to find that AMRI's written anti-discrimination policy was, in light of the overtly expressed gender bias of its managing officers, not worth the paper it was written on. Moreover, there was evidence from which the jury reasonably could infer that Keith Rippy, AMRI's chief executive officer, acted maliciously, knowing full well that carrying out his gender-based bias against Menchaca violated federal law. There was also a significant amount of evidence from which the jury reasonably could infer that Rippy and Joseph Lampinen, the company's vice president, testified falsely at trial and fabricated "reasons" for discharging Menchaca that had no basis in fact and/or were not actually considered at the time of termination. Finally, there was evidence from which the jury reasonably could infer that AMRI fabricated new "reasons" for the termination during the course of litigation. This evidence was sufficient to support a jury finding that AMRI knew that its actions violated federal law or, at least, acted in the face of a perceived risk that the law was being violated, and that it did not engage in a good faith effort to comply with the law. In short, the evidence amply supported an award of punitive damages under *Kolstad*. *See Bruso*, 239 F.3d at 858 (showing of reckless disregard under *Kolstad* may be made by showing that defendant's employees lied to plaintiff or to the jury to cover up discriminatory actions).

Under Title VII, the amount of punitive damages is capped at varying amounts based on the number of employees that the defendant had "in the current or preceding calendar year." 42

U.S.C. §1981a(b)(3). AMRI says that because it had no remaining employees at the time of the judgment, the punitive damage award must be reduced to zero. Though neither party has cited any authority construing the statute's language, the Seventh Circuit has interpreted virtually identical language in another part of Title VII – the provision describing those "employers" who are subject to the law's requirements – as referring to "the year in which the alleged discrimination occurred." *Komorowski v. Townline Mini-Mart and Restaurant*, 162 F.3d 962, 965 (7th Cir. 1998). The Court believes that the Seventh Circuit would apply this same construction to §1981a(b)(3) and thus rejects AMRI's argument. We agree with the parties, however, that the punitive damages award cannot exceed $300,000 due to the cap established by 42 U.S.C. §1981a(b)(3)(D).

AMRI also contends that the punitive damages award would be excessive even after the reduction required by §1981a(b)(3)(D). Its argument, however, is cursory and undeveloped, consisting only of a citation of the general rules concerning punitive damages and a one-sentence argument that "the award has no rational connection to the evidence." Dfdt. Mem. 14. By making such a cursory argument, AMRI has effectively forfeited the point. Moreover, AMRI cites no authority for the proposition that a punitive damages award only two and one-half times the amount of compensatory damages violates either the Constitution or the principle that a jury award that is monstrously excessive or the result of passion or prejudice should be vacated. *See Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. ___, 121 S.Ct. 1678, 1684 (2001); *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993). The Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc.*

*v. Gore*, 517 U.S. 559, 575 (1996). Here the jury reasonably could have found that AMRI's chief executive officer and its vice president terminated Menchaca based on an abhorrent stereotype, concocted a cover story, and lied about it at trial. Under the circumstances, a punitive damages award at a level double or triple the amount of back pay was in no way "monstrously excessive."

The Court's error in the instruction regarding back pay, however, likely affected the punitive damage award as well. Plaintiff's counsel asked for an award of three times the requested back pay, *see* Tr. 1362, and the jury did exactly as he asked. Under the circumstances, a lower back pay award likely would have resulted in a lower punitive damages award. Because the Court is ordering a new trial on the issue of back pay, AMRI is likewise entitled to a new trial on the issue of punitive damages.

## Conclusion

For the foregoing reasons, defendant's motion for a new trial is denied as to the issue of liability but granted as to the issue of back pay and punitive damages. Defendant's motion for remittitur is denied, and its motion for amendment of judgment is denied as moot. The case is set for a status hearing on January 25, 2002 at 9:30 a.m. for the purpose of setting a prompt trial date.

MATTHEW F. KENNELLY
United States District Judge

Date: January 14, 2002

14